Spencer-Mr. Hamill you may proceed. Good morning, Your Honor. Good morning. Thank you, Mr. Court, Counsel. My name is Fletcher Hamill and I represent the defendant Alphalan, Kevin Sims. This case is a referral from the judges for granting the state's directive finding and denying the defendant post-conviction relief halfway through the evidentiary hearing on the post-conviction petition. And an issue in this case is whether or not the defendant presented sufficient evidence to make a substantial showing that there existed an undisclosed testimony for leniency agreement between the state's attorney in this case and her star witness, jailhouse informant, Benny Dowell, that was not disclosed to the defense. The defendant was not able to extract from Ms. Andrews' order and from Mr. Dowell a confession that an agreement existed. However, he didn't need to do that. The standard that's been set forth by the case law on this issue, particularly the Supreme Court and Jimmerson, is that there doesn't need to be an explicit agreement. There doesn't need to be a formal written or flushed out agreement. A week and a nod is enough. And also in Jimmerson, the Supreme Court implored reviewing courts not to abandon their common sense when reviewing evidence in these cases. And then also in Diaz, which is also discussed in my opening brief, I think it's very important, the Apollo Court found the existence of a testimony for leniency agreement in a case where there was no confession by either the state's attorney or by the witness that an agreement existed. There was only a plea agreement that occurred during the pendency of the other case and a notation on a jacket file that mentioned his participation in the other case. So it is certainly not necessary to actually extract a confession from somebody. And so what's left is for this court to review the evidence that was presented and determine whether or not this was sufficient to make a showing that an agreement existed. And in this case, it was sufficient. There are two favors that Karen Andrews did for Benny Dyer during the pendency of these cases. First, on July 15, 2003, happens to be the exact same day that he came forward to the police, or to her, and gave his very first statement. On that same day, Karen Andrews agreed to reduce his bond by $10,000. Now, the record shows that the defense counsel somehow became aware of some of this. He became aware of the fact that Benny Dyer had his bond reduced. He didn't, apparently, and we don't know if that's because she disclosed it to him or what, or if he heard it from somewhere else. But he definitely didn't hear that it was by agreement, or that it was on the exact same day that Benny Dyer made his first statement. Now, that alone, I should be able to stop right here, and this should be enough to send this case back for a conclusion of the post-conviction hearing. Because this man received a bond reduction of $10,000 on the very same day he gave his statement. What else would this be? If this is really unrelated, what a coincidence. The bond reduction was made apparent to the jury, wasn't it, at least a couple times? Well, the fact of the bond reduction was made apparent. It's the by agreement and the exact time. And I think it's this one. It wasn't disclosed to the jury. Right, those two weren't. That he made his statement that same day. Right, that was not. What he was impeached on was, and basically what he admitted on the cross-examination was, sometime shortly after I made my statement, I did get a bond reduction. It could have been that he had a contested motion and won. Defendants do do that on occasion. The jury wasn't told. The state's attorney, the very same woman who took his statement, went into his court, apparently, and that's what is at least implied by the order that's in the record, and agreed to it. A $10,000 bond reduction. And she's asked then, in the post-mission hearing, why did you do this? And what is her answer? I can't even remember that it was that day. And was it even close to it in time? I don't remember. How did she not remember that? If this is really a coincidence, isn't it odd? Wouldn't that be something you would remember? Hey, weren't you the guy that was in my office earlier today? What a shock. But she doesn't remember. That's her answer. And I think that's an important point, because this is something that comes up often in the testimony in this case, is that Karen Andrews' denials themselves are often the strongest evidence that there is an agreement. And the fact that she passes selective admonition, she remembers. She remembers that the bond was originally $25,000. She remembers that it went down to $15,000. She remembers that he originally had $2,500 posted before the bond reduction in his other case. So she remembers that she was making it so that he would have to post $4,000 that she knew he had. She remembers all that, but she doesn't remember the same day that he gave the statement to her and the police. So on that issue alone, that should be enough. But there's a lot more. There's also on August 27, 2004, four days after Rangel testifies against the defendant in this murder case and three days after this defendant is convicted, she dismisses both of his cases. Now, this isn't even a date that is a court date. She has to actually wait until September 13 to actually file the dismissal because that's the next court date. So she just out of the blue on August 27 decides, I'm going to dismiss these cases. And she's asked again about this. Why did you do this? You know, was this part of an agreement? Well, no, I just reevaluated the evidence and I decided that it wasn't sufficient. Well, there's a lot of problems with this explanation. And the first problem is when she used the form, the form that she used had entries on it to check either I don't want to proceed, I don't want to, or I don't think the evidence is sufficient, the victim doesn't want to proceed anymore. She didn't check the one that said I think the evidence is sufficient. She checked the one that said I don't want to proceed. And that form is in the record. It's in my office in the Accounting Center brief as well. So her real-time statement when she dismisses the cases contradicts with the later testimony that she believes that, or she believed the evidence was sufficient. And that's really the first problem. And the second problem is she, this is, both of these cases against Penny Dow are aggravating intimidation of police officer cases. The victims are police officers. The witnesses are police officers. Her testimony is, well, it was a he-said-she-said credibility battle between the police officers and Penny Dow, and I didn't think my police officers could win that battle. That's her testimony. And one of these police officers, Bill Farrell, the chief deputy of Hancock County, second in charge at the time, who had testified against Kevin Simmons, was plenty credible to do that, but apparently not credible enough to testify against Penny Dow. So that, that's not plausible. But it doesn't even end there because if that's really the case, that this was a he-said-she-said case and it just wasn't strong enough, well, that was true in April and May of 2003 when she indicted the case. And it was true every month after that from May of 2003 until August 2004 when she allowed these two felony indictments to hang over Penny Dow's head and allowed the clerk to keep $4,000 of Penny Dow's money as a bond, and she didn't dismiss the cases any time during that. And, of course, it's also a question of why does it take 14 months to resolve two aggravated and intimidation police officer cases when it only took 13 months to resolve this murder case in the same county? But also, there's all this time that she could have made that re-evaluation of the evidence. She never does it until, coincidentally, three days after this conviction and four days after he testifies. That's simply not credible. Well, I guess the problem that I have is what is our standard of review in this case? Is there a third stage? It's manifest error. So the finding that you have to make is that the judge's finding that there was not sufficient evidence was manifestly erroneous. And my contention now is that it is. There's really nothing else you can conclude from this evidence. I don't think I even had another. Well, the other point I want to make, two more points I want to make about the dismissal, is that did anything come up in August of 2004 that would cause you to change your evaluation of the evidence? No. I can't think of anything. Nothing in particular, I think, is her exact words. So nothing came up. It's just a coincidence, 14 months later. It's just not credible. And taking the timing alone is circumstantial evidence that the agreement existed. And then you add on the implausibility of the denial. So she doesn't have to give explanations, but when she chooses to, you have to evaluate it. Take those two together. It's an overwhelming case that some kind of agreement existed. And it wasn't disclosed to the defense. And that's the final thing I want to point out about the dismissal. The mere fact that the dismissal wasn't disclosed to the defense is itself a little odd. It's three days after the trial. Surely she would realize that this is going to look bad. And she testified in the post-mission hearing that she didn't think she had to disclose it. Just the dismissal, not so much the agreement. She testified she didn't think she had to disclose it, which is fair enough. But she wasn't forbidden from disclosing it to the defense. And surely if she had another explanation, if it wasn't related to this case, the smart thing to do in that situation is to get out in front of it because you know it's going to look bad, and you disclose it. And you say, you know, I dismiss this case. It's because I have nothing to do with his testimony, but I dismiss this, and you should know about it, defense counsel. And get it on the record now because you know that five years down the road, somebody's going to dig it up, and it's going to look real bad. She didn't do that. So even that, I think, tends to show that something untoward was happening here, that there was something not disclosed. And finally, the state argues harmless error in this case, and I do think I should address that briefly. Benny Dow was the most important witness in this case by far. The state had no other evidence that directly indicated the defendant in this case. They had evidence that somebody beat the victim on the day of defense. They have evidence that the defendant beat the victim in the past, although their evidence in the past isn't even like the week before. It's actually their evidence stops about three years before this incident. They have nothing for the period in between. It's all Benny Dow. Benny Dow is the only thing that makes their case legally sufficient. And you should also consider that the defense had a pretty – about as close to a perfect alibi as you can get when the offense occurs in your own house. He had his whereabouts accounted for the entire day. And the only hole, if you could even call it that, is that he admits to being home at 10 o'clock in the morning. And he's able to bring in evidence from – the name is Jeff Bisbee, the witness who testifies that he actually walked through the defendant's yard at noon and walked past the area where the victim's body would have been found and didn't see a body. So it's a very good alibi. And you have that versus this jailhouse informant. And the state brings up that, well, he was impeached for a lot of things, and that's true. But obviously the jury had to believe him because otherwise they couldn't have convicted the defendant in this case. And would adding this deal to the impeachment have made the difference, make the jury not believe Benny Dow? It could very well have. Thank you. It could very well have made the difference in this case. So you're saying that absent Benny Dow's testimony, there isn't enough in the state's case to allow the jury to convict him? I don't think there is. I really don't. You're probably going to do something with your bargain had it not been for his testimony. But ultimately – and actually I say it, I don't have the name of the case, but I saw it in a case in my briefer, a public court case involving an arson where they had evidence of an arson, they had evidence that the defendant had committed arsons in the past in the same property, and the public court held that that wasn't sufficient to support the defense condition of an arson. I suppose we would have to see the evidence and what it would look like without Benny Dow, but I think there would at least be a strong argument that the evidence would be insufficient without him. So the non-disclosure of this agreement is a crucial part of this case, so I don't think how much there can be found here at all. And unless your honors have any further questions, I thank you for your time. I don't believe we do. Thank you, Mr. Hamill. Mr. Gennadievic, you may respond. Thank you, your honor. May it please the court, counsel. We are here today with respect to trial judge's granting of the state's motion for directive finding at the close of the defendant's case in the third stage post-conviction petition hearing. The state's position, quite clearly, is the fact the trial judge did not err in granting that directive finding. Our basic two points are that, number one, there was a complete failure to establish that there was any agreement, testimony for leniency agreement between the state and Benny Dow, and secondly, we argue that even if we assume for the sake of argument that there was, the defendant nonetheless still has not established a grading violation in that he hasn't established that the agreement impeachment was of such a character that its suppression undermines confidence in the ultimate verdict that was reached in this case. What I'm going to do is, for the most part, my argument is going to really somewhat be kind of addressed toward the harmless error side of it because it kind of incorporates both arguments that I presented. As your honor asked, this court's standard review in a third stage PC finding, but a trial judge here, is the fact that you must find that the trial judge's decision is manifestly erroneous, which is the fact that the error here claimed is clearly plain, evident, and indisputable. When you add that to the nature of the issue here, which is a grading violation, under Brady, the state is required to disclose favorable evidence. It is material, and it's material within Brady. If there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. The review of this aspect of Brady is not reasonable doubt. It's not a question of whether or not the defendant was proven guilty beyond reasonable doubt. Rather, the defendant must show that the favorable evidence could have reasonably put the whole case in a different light as to undermine confidence in the outcome. It's not reasonable doubt. We're talking about would the addition of this agreement, had this come out that there was this agreement for testimony deal that was done, would that have undermined confidence? Does that failure to disclose that undermine confidence in the verdict? Now, in this case, what the trial judge found, the trial judge made certain findings. He found specifically that the only evidence that was deduced that restricted anything about an agreement was from Karen Andrews, former state's attorney. And he found that the testimony that was provided by the defendant or tried to be elicited through Karen Andrews was insufficient to establish that there was an agreement. He found that Karen Andrews provided an answer as to why she had dismissed the case. He found her testimony, her explanation, credible. He said that the fact that she simply did this was insufficient evidence. The fact of the timing of everything, even though he even noted, if you will, the coincidental timing of it all, which I am not disputing any of that. He said that still, in the trial judge's mind, was insufficient to prove that there was an agreement. So the coincidence alone was not enough in the trial judge's mind to establish that there was an agreement. What the defendant has argued this morning and what he's arguing in this brief, is basically three points that he relies upon to try to establish an agreement. First, he refers to the reduction in the defendant's bond. Secondly, he talks about how Benny Dowell's case was dragged to the court system in Hancock County. And thirdly, he talks about the fact of filing the non-profit three or four days after the conclusion of his case. Where all of this and how all of this is important comes into with respect to the Brady violation itself, and if you will, the harmless error aspect. But I also think it helps to establish the fact that there was no agreement. I'll try to remember to get to that last point after I finish talking about how Benny Dowell was impeached. Now, we're talking about an agreement. And so we're talking about disclosing an agreement for purposes of impeaching the credibility of Benny Dowell. At trial, Benny Dowell was impeached. First of all, defense counsel brought up the fact that he had been charged and was in jail. He specifically brought out the fact that he was charged with two counts of intimidation of correctional officers. He also brought up the fact that Benny Dowell was unable to post bond on the second one. So Benny Dowell was sitting in the county jail. At the time, the defendant was charged with murder and arrested and placed in jail. Defense counsel then noted that Benny Dowell's bail had been reduced a day or so after Dowell first spoke with the prosecutor. That, I believe, can be found in R657 in the record during the trial. This would be, I think, Volume 9 of the recorded proceedings. So counsel brought out the fact that within the day or so after Benny Dowell spoke to the prosecutor, his bail was reduced. And he was able to step free. The defendant was also impeached with this prior record. Trial counsel also noted the seemingly slow pace that the defendants, as defense counsel put it, non-complicated cases involved, certainly seemed to be languishing in the Hancock County court system for quite a long time. He also noted that his charges, Benny's charges, were still untried at the time that the defendant was being tried. Where was this noted before the jury? This was noted at trial. What phase of the trial? Oh, cross-examination of Benny Dowell. This is all cross-examination of Benny Dowell. Was it brought out in closing? Yes. He also brought out the fact that Benny Dowell's crimes occurred prior to the time that the defendant had been charged with murder and had been arrested. So he brought out the fact that Benny was still charged but untried, and his cases were uncomplicated, and here we are in a murder trial of the defendant. Now, trial counsel did ask Benny directly if he hoped to get any kind of beneficial treatment. Now, although Benny said no, the seeds had been laid with the jury that this is where defense counsel was going. There was nothing direct that there was any agreement, but he did ask Benny, do you hope that you're going to get any benefit out of it? Are you hoping to get something for your testimony here? And Benny said no. Now, in addition, Benny was also, if you will, impeached through the playing of the telephone conversation. He testified about the wooden dowel and what he thought this telephone conversation was, and if you will, he was impeached because they played a recording of it, and what the recording provided was different than what Benny had testified to. So Benny was impeached at least with the three things that the defendant complains about today. Benny was impeached on two of those three, the delay in the case and the bond reduction within a day or so after talking to the prosecutor. Now, of course, he's not going to be able to take and impeach Benny with the fact that his cases were dismissed because at the time he testified they weren't. So that one, there's no way that he can do that. And to suggest that Karen Andrews should have somehow sent him the defendant's notice of that after she did it, I don't think that that plays into anything. I think that at that point I think the defendant is really reaching. But when you look at the totality of what he was impeached with, the question we have to ask is, if you simply add to the equation the fact that there was a quote-unquote, assuming I'm doing a specific agreement, that, you know, Benny did, he testified for me, and he testified truthfully, and he testified according to his statement, I'll dismiss your case. Is that really going to take and impact the credibility of Benny Dow above and beyond how he was already impeached with just about almost everything that he could be impeached with? I submit the answer is no. I don't think it makes any difference whatsoever. The jury had more than enough evidence before it that if they didn't want to believe Benny Dow, they wouldn't have believed Benny Dow. They chose to believe Benny because his testimony about what was said – How do you draw that conclusion that they chose to believe him? Because they heard the tape themselves. Yeah. So I'm not sure we have to accept the premise that the jury believed Dow. They could have rejected his testimony, considered the contents of the tape, which was the defendant's voice, asking his sister to retrieve the stick. From his attorney. And convicted on that basis. Alone, or am I wrong? My understanding from what that tape shows, from what the tape recording is, I don't think they could have necessarily convicted the defendant on that tape alone because that tape was not incriminating. What did Dow add that the tape did not prove? Well, what Dow added in his testimony was simply the fact that the defendant and the victim were arguing that when the victim went out to hang her clothes and stand on these wooden boards around this porch on this dowel rod that she had between two posts, that he pushed her up. When she fell, she took the rod with her. In other words, when she fell forward, she took the dowel rod with her. The defendant then went out, picked up the dowel rod, beat her with it, and kicked her. That was pretty much what Benny Dow testified as the defendant said. Simple, straightforward. The evidence, the other objective evidence, and that other objective evidence is, number one, Benny had never been to this place. He didn't know about the stack of wood that she stood on in order to be able to reach the bar to hang her nursing clothes on to take them dry. Benny didn't know about the fact that there was a dowel rod between the two pillars. The evidence shows that pictures that were taken at the scene, shortly after the victim was found, and police were called, the picture of that porch showed there was no dowel rod up there. And there was no dowel rod to be found anywhere in the area. Subsequently, months later, when they go back to the scene, they take a picture, and lo and behold, what's between the two pillars? A dowel rod. But that dowel rod was not the same one that had been there that the mom had used. I believe that testimony came from one of the children, if I'm not mistaken. In addition, the medical evidence established this victim, to say the least, was savagely beaten. Her liver was nearly severed, completely, in hand. It was a five out of a six. You do not obtain, you do not sustain a severed liver by falling off a porch three, four feet high. This lady was savagely beaten to death. And what gave credibility to Benny's testimony was the fact that the things that he did not know, and the only way he could have found them out, was through the defendant. So when you take a look at the totality of the evidence that was presented, and you take a look at the totality of the evidence presented that was used to impeach him, to me, it's understandable why the jury did find Benny Dowell credible, notwithstanding this. And when you add in the fact of the agreement alone, I don't think that tips the scale. That certainly, at least in my book, doesn't even come close to rendering, for me to take in question, the veracity of that very book. Thank you. I would just like to take and throw one thing out. We talk about disagreement, wink and a nod. Am I going to stand up here and try to convince this court that that never happens? There's no way. But I want to throw this out to you. I believe that there can be a situation, a circumstance, in which a prosecutor can say, I am not making any agreement with you. You want to come forth and testify, you come forth and testify truthfully, I'm making no agreement. The fact that the prosecutor subsequently, four days, let's say, three days, two days, the next day, after a trial, decides, I'm going to take and dismiss the charges, I refuse to prosecute. Does that mean that there was an agreement between the state and that witness to testify truthfully? I submit that it doesn't. The fact that we have, what we have in this case and what we're dealing with in this case, the fact that the counsel himself has to say there's no direct evidence of agreement, but what we have to do is, we can infer this from this, we can infer this from that, okay, that's fine. I'm not here to take an argument. All I'm here to basically take and say is the fact that, in reality, there could be another scenario. There could not have been, there might not have been, an express agreement. There could have been no agreement. And Karen Anderson would have just decided to do this because she was a state's attorney. She has the authority to decide who to prosecute under what circumstances. That would not be an agreement. To find an agreement on this evidence basically really opens up a lot of different things. It opens up a lot of decisions and questions by prosecutors that they make on a daily basis. So to find an agreement in this case, I think I would just caution the court to look at the potential ramifications from finding an express agreement on this case under this kind of evidence. You don't need to define an express agreement. Pardon me? You don't need to define it. No, I was just going to get that. But you don't need to define that in order to affirm it. But even if you did, based on this, I don't think that there was a Brady violation because of the standard that you have to use to review this case and because of the Brady standard. This evidence would not tip the scales to take into question the veracity of this verdict. Therefore, the state would ask this court to affirm unless there are any questions. Thank you very much, Your Honor. Thank you. Mr. Hamill, you may reply. Thank you, Your Honor. A couple of points. Starting with the last point that Mr. Vanden Heuvel made, I'm not contending that the timing alone is enough to show that there was an agreement. I don't think that every time you have a dismissal that happens to be in a suspiciously timed next to the other case's resolution that there must be an agreement. However, when that happens, there ought to be an explanation. And here, Karen Andrews gave her explanation. We don't have to speculate what was her scenario. We heard it. It was horrible. It was simply implausible. And that's why you can find an agreement here. And the second thing is that regardless of what she said about the dismissal, regardless of whether or not you think there's direct evidence – well, there's not direct evidence, and the defense counsel wasn't told about that. And that should be enough right there to find that there was an undisclosed agreement. Now, moving on to Peggy Dow's testimony, there's a lot to say about this. First of all, the corroboration that Mr. Yovanovitch refers to is really – is barely existing. There's no question that the victim was beaten. And Benny Dow knew that the victim was beaten because Benny Dow heard the telephone conversation where it comes in and talks about her being charged and beating her. So he knew she was beaten. This isn't some case where, you know, Benny Dow said she had a bruise in her – or Benny Dow said that maybe, you know, Kevin Simmons had a hair in a particular place, and then there's a bruise in that particular place on her body. There's nothing like that. It's simply he said she was beaten. The evidence says she was beaten. The defendant always says she was beaten. Everybody says she was beaten.  Same thing with the porch and this infamous dowel rod, which, by the way, the infamous dowel rod was never brought – the actual dowel rod, the one that was on the porch, actually was recovered. It was turned over to the state's attorney, Karen Hammonds, and she lost it. So that's why that wasn't brought in as evidence. So it's not something the defendant did. And that's really the point. You know, Benny Dow versus the tape recording of the conversation between the defendant and his sister. Benny Dow says the defendant told me that he beat her with a dowel rod. Then I heard the defendant call his sister and tell his sister she had to get rid of that dowel rod because that dowel rod would incriminate him. And what the tape reveals is that, you know, whatever the reason, you know, Kevin Simmons, his theory on this case is not I was there, I saw what happened, I know what happened. His theory on this case is I have no idea what happened here, and I'm, you know, just basically making up theories based on what the police tell me. That's his theory on the case. So he somehow got from the idea – you know, got the idea in his head from the discovery that the dowel rod would help him. And – That's a very beautiful ending. Thank you. So the tape reveals he calls his sister and he says, you've got to get this dowel rod. And my attorney has it. You've got to recover it. You've got to get it to my new attorney. That's what he said. So it's the exact opposite of what Benny Dowell said the conversation was. And that's the one thing that could really corroborate Benny Dowell, because that's the one thing where you can see – you can look at what he said versus what, you know, reality is. And he was the opposite of reality. So, you know, he – there really was a corroboration here. And so it was meaningful that he could be impeached on the things that he was impeached on. And, yeah, he was impeached on the fact that his bond was reduced. He was impeached on the fact that his cases were still pending. But there's a far cry from his bond was reduced by agreement on the same day and from the fact that he was, you know, probably expecting that the cases would be dismissed. Or if he wasn't expecting it, you know, it's the fact that they were dismissed later. I mean, it's something that should have been – you know, should be brought up. So – and it would – and it absolutely could have made a difference in the outcome of this case, because the jury had to – had to believe Benny Dowell in order to – So, I don't see your Honors have any further questions. I'd ask that you reverse Mr. Simmons' convictions and remand the cause for, actually, the conclusion of the post-conviction proceedings. I don't believe there are any further questions. Thank you, counsel, both, for your arguments in this manner this morning. This hearing will be taken under advisement and written dispositions shall issue.